UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 CR 87 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| CHRISTOPHER PORTER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On June 1, 2022, a jury convicted defendant Christopher Porter on three counts of bank robbery in violation of 18 U.S.C. § 2113(a) and one count of brandishing a firearm during and in relation to a bank robbery in violation of 18 U.S.C. § 924(c)(1)(A)(ii). On September 1, 2022, defense counsel filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c), or alternatively for a new trial under Federal Rule of Criminal Procedure 33 [141]. Acting on his own, Porter also filed multiple motions and letters arguing for judgment of acquittal and/or a new trial [127], [155], [156]. The Court struck the pro se motions, but later reinstated them after allowing trial counsel to withdraw from the case and appointing new counsel. On July 18, 2023, the Court heard brief argument from Porter on his motions. For the following reasons, the Court denies all motions—made either by defendant or through counsel—for judgment of acquittal or a new trial.

**Background**

Law enforcement arrested Porter on February 4, 2021 following a bank robbery at a Fifth Third Bank in Little Village, Chicago. On March 4, 2021, a grand jury returned an indictment charging defendant with three counts of bank robbery for robberies that occurred on November 13,

2020 (Count I), December 22, 2020 (Count II), and February 4, 2021 (Count IV).  Count III charged Porter with brandishing a firearm during and in relation to the bank robbery on December 22, 2020.

At trial, the government submitted evidence and called various witnesses to connect Porter to the robberies.  As to the November 13, 2020 robbery, bank teller Patricia Sweeten testified that a man put a gun in her face and told her to put money in a bag that he handed her.  The jury viewed video recordings of the incident, which showed the robber wearing a white mask, a black hat, blue jeans, and black-and-white shoes.  Additional video showed the robber arrive to and leave from the bank in a silver Ford Explorer with a distinctive, circular rear window decal.  The vehicle did not display a license plate at the time of the robbery, but the government introduced National Vehicle Location Service reports showing a silver Ford Explorer two days before and on the date of the robbery with the same window decal bearing an Indiana license plate.  Records showed that the vehicle was registered in Porter's name.

Three bank employees testified as to the events during the December 22, 2020 bank robbery.  Diana Engstrom testified that she was working as a teller at the bank and described the robber as a Black man who was between six-feet and six-feet-two-inches tall.  The second employee, Zainab Shukair, stated that the robber held a gun and gave the Ms. Engstrom a bag to put cash in. Javier Florez, the final bank employee, described the robber as "over six feet tall" and "definitely not thin."  These descriptions were supplemented with video footage of the robber, which showed a man wearing a burgundy jacket, burgundy pants, a red hat, and a face mask.  Task Force Officer ("TFO") Randal Hansen testified to two 911 calls describing the robber as wearing red and driving away in a silver Ford SUV.  Surveillance footage captured the SUV, which no longer displayed the distinctive decal but had a light-colored ring around the front passenger-side tire.  Police Observation Device ("POD") cameras also showed the SUV stop and an individual fitting the robber's description exit the vehicle and work on something on the rear hatch.  A license plate

reader shortly thereafter captured the SUV bearing the license plate registered to defendant in a nearby location.

One bank employee testified regarding the February 4, 2021 robbery. He stated that the robber pointed a gun at the employee and a customer and demanded that the employee put $20,000 into a bag he provided. The employee described the robber as African American, six-feet to six-feet-and-five-inches tall, and in his 40s to 50s-ish. The employee testified that the put a number of coin trays in the robber's bag. Bank video footage also provided the jury with images of the robber wearing a black beanie, jeans, a Chicago Bears face mask, and a black jacket. Chicago POD footage showed a silver SUV in the area of the robbery shortly thereafter. TFO Hansen testified that approximately forty-five minutes after the robbery, the FBI stopped the silver SUV registered to Porter. He also identified Porter as the individual driving the vehicle. In the SUV, the FBI found a Chicago Bears face mask, a black beanie, a green dime tray (which the bank employee testified at trial was consistent with the one of the trays he provided to the robber), a black jacket, and mail addressed to Porter. The front passenger-side tire of the vehicle additionally had a white wear ring. Porter had $4,824 in cash in his pocket, which the government seized.

Finally, TFO Hansen testified to the descriptive information associated with Porter's driver's license. That is, that Porter is a male, six-foot-two-inches tall, and 255 pounds. The government asked TFO Hansen "And how does that square with descriptions of the offender that you received during the course of the investigation." Hansen responded, "It matches the description of the bank robber." (Tr.[1], at 302–03.) The government also called Bradley Yamaji, a Chicago Police Department officer who conducted a traffic stop of Porter on February 2, 2021, during which

---

[1] "Tr." shall refer to the trial transcripts. (Dkts. 129–34.) The Court adopts the pagination identified on the transcripts in the upper-right-hand corner of each page.

Porter was behind the wheel of the silver Ford Explorer registered in his name. The government introduced the body-worn camera footage of that stop.

Before the close of the government's case, the Court previewed the issue of Porter's right to testify or not to testify. The Court instructed Porter that he must soon decide whether to take the stand and that he should consult with trusted individuals, if he wished, about his decision. (Tr., at 325.) The next day, the government rested, and the defense moved for a judgment of not guilty on Counts I–III on the basis that there had been insufficient evidence identifying Porter as the robber. The Court denied the motion. (*Id.*, at 418.) The Court then reopened the conversation about Porter's right to testify. Ultimately, the Court concluded that Porter knowingly and voluntarily waived his constitutional right to testify. (*Id.*, at 418–22.) After some additional evidence and closing arguments, the jury began deliberations on May 31, 2022. On June 1, 2022, the jury returned with a verdict of guilty on all counts.

**Discussion**

Motion for Judgment of Acquittal

Defendants seeking a post-trial judgment of acquittal face an extremely high hurdle. *United States v. Vizcarra-Millan*, 15 F.4th 473, 506 (7th Cir. 2021). This is because when assessing Rule 29(c) motions, "courts view the evidence in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Wallace*, 991 F.3d 810, 812 (7th Cir. 2021). In doing so, courts do not re-weigh the evidence or second-guess credibility determinations and make all reasonable inferences in the government's favor. *United States v. Ginsberg*, 971 F.3d 689, 695 (7th Cir. 2020).

Porter moves for judgment of acquittal on the basis that the government failed to sustain its burden beyond a reasonable doubt as to the identification of Porter as the robber. Porter, through

counsel, admitted that the government provided circumstantial evidence establishing that his appearance *resembled* the robber, but stated that there was no direct evidence that could support such a finding beyond a reasonable doubt. Ultimately, Porter argues that the government's identification evidence was speculative. In reply, Porter added the assertion that the government's closing argument intentionally encouraged the jury to speculate about the robber's identity.

Viewing the evidence and making all reasonable inferences in the government's favor, the Court finds that there was sufficient trial evidence from which the jury could reasonably conclude that Porter committed all three robberies. As Porter acknowledged, a direct, in-court identification by an eyewitness to the crime is not required to establish identity so long as the "defendant's identity can be inferred from the circumstances." *United States v. Armenta*, 883 F.3d 1005, 1008 (7th Cir. 2018). The government provided sufficient evidence for the jury to make this inference. Specifically, the government showed that a person of the same description committed robberies on three separate dates driving a silver SUV registered to Porter. The eyewitness descriptions of the robber's height, weight, and age matched those listed on Porter's state identification. In addition, the jury had photo and video evidence of the robber that they were able to compare to the defendant during their in-court observations. The jury could also reasonably infer that the Porter drove the SUV during the second robbery because the robber removed the vehicle's license plate to conceal the vehicle owner's—Porter's—identity. After the third robbery, FBI agents arrested Porter while driving the silver SUV, wearing clothes matching the robber's description, and possessing $4,824 in cash, $107 in rolled coins, and a green dime tray from the bank. Finally, the robber committed all three robberies in a similar fashion—wearing a face mask and hat, demanding cash in a bag, pointing a black handgun at tellers and customers, and fleeing in a silver Ford Explorer. This evidence demonstrates the robber's *modus operandi*, such that it shows the robber's "distinctive method of operation." *United States v. Robinson*, 161 F.3d 463, 467 (7th Cir. 1998). Therefore, the

jury could link the identity evidence from the third robbery to the other two robberies. *See, e.g.,*
*United States v. Edwards*, 26 F.4th 449, 453–55 (7th Cir. 2022).

In sum, the government provided sufficient evidence to allow a rational trier of fact to
identify Porter as the robber and find him guilty on all four counts. *Wallace*, 991 F.3d at 812.
Porter's motion for judgment of acquittal is denied.

<u>New Trial Motion</u>

Rule 33 authorizes district courts to "vacate any judgment and grant a new trial if the interest
of justice so requires." Fed. R. Crim. P. 33. Granting a new trial is "reserved for only the most
extreme cases," and courts "approach such motions with great caution." *United States v. Coscia*, 4
F.4th 454, 465 (7th Cir. 2021) (citations omitted). "The applicable standard under Rule 33 requires a
new trial 'only if there is a reasonable possibility that the trial error had a prejudicial effect on the
jury's verdict.'" *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019) (quoting *United States v.*
*Flournoy*, 842 F.3d 524, 530 (7th Cir. 2016)). "The ultimate inquiry is whether the defendant was
deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713 (7th Cir. 2020) (citation omitted).
District courts have considerable discretion in determining Rule 33 motions. *Id. at* 716. Acting pro
se and through counsel, Porter makes several arguments supporting his motion for a new trial.

*TFO Hansen's Identification*

Porter again takes issue with the identification evidence of Porter as the bank robber in
Counts I–IV. At trial, TFO Hansen testified that Illinois Secretary of State records for Porter listed
him as male, six-foot-two-inches tall, and 255 pounds. Based on the descriptions of the offender
that he received during the investigation, TFO Hansen stated that those identifiers "match[ ] the
description of the bank robber." (Tr., at 302–03.) Porter argues that through this testimony, TFO
Hansen "opined through inference" that Porter was the person in the bank surveillance footage,
which constituted an improper lay opinion under Federal Rule of Evidence 701. Because counsel

did not object to the testimony at trial, Porter does not contest that the Court's review is for plain error. *United States v. Bell*, 624 F.3d 803, 810 (7th Cir. 2010); *see also* Fed. R. Evid. 103. "Under plain-error review, the defendant must show that (1) there was error, (2) it was plain, (3) it affected his substantial rights and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Jumah*, 599 F.3d 799, 811 (7th Cir. 2010) (citation omitted).

Porter abandons his Rule 701 argument in reply, for good reason. TFO Hansen did not provide an improper identification. *Cf. United States v. Jett*, 908 F.3d 252, 271–72 (7th Cir. 2018) (finding error, albeit harmless, where agent explicitly identified defendant as the robber based on surveillance footage). Instead, TFO Hansen merely answered that eyewitness descriptions of the robber were consistent with the height and weight listed on Porter's state identification. Comparing the descriptive features on Porter's driving record with those given to him by eyewitnesses did not require an improper opinion. Thus, the Court finds no error in TFO Hansen's testimony.

In reply, Porter raises a new improper identification argument, maintaining that the government committed clear error by arguing that Porter had been identified as the bank robber in all three robberies. Porter's reference to TFO Hansen's in-court identification is misplaced. The agent only directly identified Porter as the individual arrested directly following the February 4, 2021 robbery. The government did not argue that this in-court identification proved anything more. Similarly, Porter's new argument that the government, in closing argument, "intentionally encouraged" the jury to speculate that Porter had been involved in all three robberies fails. Porter maintains that government counsel's statement "We submit that the evidence in this case shows Christopher Porter committed those bank robberies beyond a reasonable doubt," calls for speculation. As previously explained, the government put forward sufficient evidence for the jury, based on all the evidence, to identify Porter as the bank robber on all three dates. The government's

argument did not call for improper speculation and Porter's motion for a new trial is denied on

these grounds.

*Jury Instructions*

Next, Porter argues that the Court erred when it declined to give Porter's proposed

instruction on speculation. Porter request that the Court give the jury the following instruction:

> A jury cannot speculate its way out of reasonable doubt. Speculation cannot be the
> basis for proof beyond reasonable doubt. A strong suspicion that someone is
> involved in a criminal activity is no substitute of guilt beyond a reasonable doubt.
> Although a jury may infer facts from other facts that are established by inference,
> each link in the chance of inferences must be sufficiently strong to avoid a lapse into
> speculation.
>
> *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009)
> *Piaskowski v. Bett*, 256 F.3d 687, 692–93 (7th Cir. 2001)

(Tr., at 465–68.) The Court rejected the proposed instruction, reasoning that the remaining jury

instructions were sufficient to prevent the jury from engaging in improper speculation and that the

proposed instruction ventured into a definition of reasonable doubt. (*Id.*) At trial, the Court

instructed the jury: "You must consider each charge and the evidence concerning each charge

separately. Your decision on one charge, whether it is guilty or not guilty, should not influence your

decision on any other charge." (*Id.*, at 551.) In addition, the Court instructed the jury that "People

sometimes look at one fact and conclude from it that another fact exists. This is called an inference.

You are allowed to make *reasonable inferences*, so long as they are *based on the evidence*." (*Id.*, at 548

(emphasis added).)

"A defendant is entitled to an instruction on [his] theory of defense if: (1) the instruction is a

correct statement of the law; (2) the evidence supports the theory of defense; (3) the defense is not

part of the government's charge; and (4) the failure to give the instruction would deprive the

defendant of a fair trial." *United States v. Dickey*, 52 F.4th 680, 686 (7th Cir. 2002) (internal citation

omitted). Here, Porter was not entitled to his proposed jury instruction because it was duplicative of

the Seventh Circuit Pattern Criminal Jury Instructions 2.02 and 4.06. Those instructions informed the jurors about the kinds of inferences they were permitted to make. The Pattern Instructions accurately stated the law, and "juries are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841, 129 S. Ct. 2139, 173 L. Ed. 2d 1184 (2009). Therefore, Porter's proposed "instruction would have been at least repetitive, if not also confusing to the jury" and the Court's decision not to give it did not deprive Porter of a fair trial. *United States v. Brown*, 865 F.3d 566, 572 (7th Cir. 2017).

*Brady Obligations*

Porter, through counsel, argues that the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), when it failed to disclose information about TFO Hansen's physical surveillance of Porter and tracking data for his SUV prior to trial. *Brady* requires law enforcement officers to "turn over potentially exculpatory evidence when they turn over investigative files to the prosecution." *Jones v. York*, 34 F.4th 550, 558 (7th Cir. 2022) (quotation omitted). A prosecutor's obligation to comply with *Brady* is ongoing and continues through trial. *See Whitlock v. Brueggemann*, 682 F.3d 567, 588 (7th Cir. 2012). When claiming a *Brady* violation, the defendant "bears the burden of proving that the evidence is (1) favorable, (2) suppressed, and (3) material to the defense." *United States v. Edwards*, 34 F.4th 570, 587 (7th Cir. 2022) (quotation omitted).

Before trial, Porter filed a motion for disclosure of *Brady/Giglio* material concerning the vehicle tracking device attached to Porter's silver Ford Explorer. (Dkt. 69.) In response, the government provided additional information to Porter, including tracker data, vehicle-detection reports, and surveillance and POD footage. (Dkt. 85.) Thereafter, Porter's *Brady/Giglio* motion was stricken without prejudice because defense counsel represented to the Court that all requested discovery had been tendered. (Dkt. 93.)

At trial, TFO Hansen stated on cross examination that federal agents conducted physical surveillance of Porter in the days following the December 22, 2020 robbery. TFO Hansen testified that he did not write a report on the surveillance conducted. Porter argues that this information was not disclosed in violation of *Brady.* But the government contends, and Porter does not dispute, that the government had tendered to Porter the government's application for a tracker warrant prior to trial, which contained an affidavit discussing that surveillance. As a result, Porter narrows his argument in reply, maintaining that the government failed to disclose "*exactly where* Mr. Porter's Silver Ford Explorer was parked when the court ordered tracking device was first attached to the vehicle by federal agents." (Dkt. 152, at 8 (emphasis added).) The exact location of the vehicle at the time the tracker was placed, Porter seems to argue, is exculpatory as it could suggest another person drove the vehicle during the robberies. But the government tendered a spreadsheet of the full set of tracker data from the vehicle, showing the location of the silver SUV from January 21, 2021 (the date of installation) to February 5, 20221 (after Porter's arrest). (Dkt. 85, at 7 n.3.) Porter therefore possessed the information about the location of the Ford Explorer after the robberies. Further, Porter fails to show how a report identifying the location of the SUV at the exact time of the tracker installation would have been material to his defense. *See Edwards*, 34 F.4th at 587.

Porter also argues that TFO Hansen's testimony suggested that FBI agents conducted physical surveillance at other locations (in addition to the disclosed surveillance), which the government failed to disclose. He contends that such information could have been exculpatory if agents observed someone other than Porter using the vehicle. Porter's assumption stems from an email sent by TFO Hansen to other agents that lists three addresses associated with Porter. The evidence does not support a conclusion the FBI knew of these addresses because agents had conducted physical surveillance at them. Rather, TFO Hansen testified that he identified these addresses as potentially related to Porter through a license place reader that showed the vehicle had

been parked in that area and a law-enforcement database search. (Tr., at 369–70.) Therefore, Porter has not met his burden in establishing that government suppressed evidence of additional physical surveillance, let alone that such evidence existed. *United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) ("[T]he defendant bears the burden of establishing a *Brady* violation by offering more than mere speculation or unsupported assertions that the Government suppressed evidence."). For these reasons, the Court finds that Porter has not sustained his claim *Brady* violation claim.

Porter also alleges *Brady* violations in his pro se letters and during his in-court argument on July 18, 2023. In writing, Porter stated he was "deeply concerned about the government withholding the $100 dollar bill, the wallet, and the bag from the defense." (Dkt. 156, at 9.) The government responded that the $100 bill was an exhibit at trial that had previously been made available to defense counsel. (Tr., at 223.) The government contends that the FBI did not place the wallet or bag into evidence, but merely documented their existence and placed them into the silver Ford Explorer, which was returned to members of Porter's family. (*Id.*, at 224.) During the July 18 hearing, Porter admitted that his brother was in possession of the wallet. Based on the evidence presented at trial that the bag had been returned to Porter's family in the car, Porter has not sustained his burden to show that the evidence was suppressed. *See Shields*, 789 F.3d at 747.

*COVID-19 Masking Policy*

In his pro se letters to the Court, Porter argues that the Court's COVID-19 masking mandate violated his due process rights and deprived him of a fair trial. During trial proceedings, the Court followed the Chief Judge of the Northern District of Illinois' Third Amended Order, which required all individuals in the courtroom, other than testifying witnesses, to wear face masks to prevent the spread of the Coronavirus. The Court also permitted counsel to remove their masks while examining witnesses and presenting arguments to the jury. Porter argues the mask policy

prejudiced him by requiring that he wear a mask in the courtroom, which encouraged the jury to associate him with the masked robber.

There is not a "reasonable possibility" that the Court's mask procedure "had a prejudicial effect on the jury's verdict." *Maclin*, 915 F.3d at 444. At the time of the trial—May 25 to June 1, 2022—members of the public were accustomed to seeing individuals in masks. In fact, the bank surveillance footage showed that most of the bank tellers and customers wore masks during the robberies. Porter was also not the only masked person in the courtroom. Apart from court staff, testifying witnesses, and counsel during presentations, everyone in the court wore masks (including the jurors). The cases cited by Porter are inapposite as they deal with the prejudice to a defendant in wearing items that imply culpability, such as prison clothing, shackles, and restraints. *See, e.g., Estelle v. Williams*, 425 U.S. 501, 512–13, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976). No reasonable juror would infer Porter's guilt by the mere fact that he wore a mask. Further, this Court has the authority "to determine what safety measures are necessary to protect the judge, court personnel, the parties, the lawyers, the jurors, and the audience in the courtroom." *United States v. Smith*, No. 21-5432, 2021 WL 5567267, at *2 (6th Cir. Nov. 29, 2021). For these reasons, the Court finds that the masking policy did not unfairly prejudice Porter or deprive him of a fair trial.

*Ineffective Assistance of Counsel*

Porter, acting pro se, asserts that his counsel was ineffective leading up to and during trial for failing to investigate and present an alibi or alternative suspect defense. To succeed on his ineffective assistance of counsel claim, Porter must show that "(1) counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment and (2) the errors deprived defendant of a fair trial." *Hoglund v. Neal*, 959 F.3d 819, 833 (7th Cir. 2020) (cleaned up) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). For the first prong, the Court applies "a deferential presumption that strategic

judgments made by defense counsel are reasonable." *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (internal citation omitted). The second prong requires a showing that, considering all the evidence, "there is a reasonable probability that the errors changed the outcome of the trial." *Cook v. Foster*, 948 F.3d 896, 909 (7th Cir. 2020). "[T]his is not an easy standard to satisfy." *Jordan v. Hepp*, 831 F.3d 837, 846 (7th Cir. 2016).

Porter's letters lay out what he believes to be a strong alibi or alternative suspect defense. At a high level, Porter states that he was in active addiction in late 2020 and early 2021. He maintains that at the time of each robbery, he was present at "crack houses" with numerous others (who Porter calls "local crack addicts") who can attest that Porter was incapacitated by his crack-cocaine use. He does not identify these individuals by their full name, but rather refers to them by nicknames such as "C-Note," "Black," "Big Rob," "Skinny Sally," and the like. Porter asserts that he informed his counsel of this defense and urged him to contact these individuals so they could testify on his behalf. His counsel's failure to do so, he contends, was objectively unreasonable and deprived him of his right to a fair trial.

Based on the evidence, Porter has not made a showing for either prong under *Strickland*. Porter claims that his counsel's failure to investigate these defenses was unreasonable. Under *Strickland*, "counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691 (emphasis added). A decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment." *Id.* Here, counsel's alleged failure to investigate does not fall below an objective standard of reasonableness. An attorney could reasonably conclude that Porter's proposed defenses would harm, rather than aid his case. First, Porter offers no relevant identifying information for his proposed witnesses. It is implausible that counsel could track down these individuals with the little information Porter provided. Even if counsel made contact, it is

13

plausible that counsel would face challenges in attempting to compel their testimony as it would require self-incrimination. Likewise, it is hard to believe that a jury would find the testimony credible, as Porter states that the proposed witnesses were under the influence of drugs during the relevant period. The evidence would also require an admission that Porter frequently used crack-cocaine to the point of unconsciousness, a fact that could harm the jury's perception of Porter's own credibility. Further, Porter argues this evidence would show that his inebriated stated rendered him incapable of operating a vehicle on the days of the robberies. But the FBI arrested Porter behind the wheel of his car a little over an hour after the third robbery, directly contradicting his defense theory. Perhaps most damaging is that this admission would introduce a motive theory otherwise unavailable to the government—had these facts come to light, the government states that it would have argued that Porter robbed the banks to pay for his drug use.

Porter received the benefit of an experienced trial counsel who was acutely aware of the risks these defenses posed to Porter's case. All the evidence suggests that his counsel weighed the risks and, with great care, decided against pursuing Porter's alleged alibi evidence. This decision is in accord with the actions of a reasonable attorney, and the Court finds no error in counsel's decision not to investigate these defenses.[2] Furthermore, even if this decision was in error, which the Court firmly decides it is not, Porter cannot show that the error would have deprived him of a fair trial. For the reasons already stated, the government presented sufficient credible evidence identifying Porter as the robber and the proposed testimony of Porter's associates would have raised significant questions of credibility and motive. Porter additionally states that if he had been permitted to

---

[2] To the extent that Porter now argues his former counsel unreasonably failed to investigate or contest the ownership of the wallet found in the Silver Ford Explorer during his arrest on February 4, 2021, his argument fails. A reasonable attorney would not conclude that the ownership of the wallet was reasonably in question. Based on the arguments made in court and Defense Exhibit A (presented on July 18, 2023), it appears that the wallet contained debit cards (which have now been tendered to defense counsel) bearing Porter's name. Further, there is not a reasonable probability that the investigation would have changed the outcome at trial given the other evidence identifying Porter, as previously discussed.

pursue his alibi theory, he would have taken the stand. If true, Porter does not explain how his testimony would have aided his alibi defense or overcome the problems previously identified. For these reasons, Porter's ineffective assistance of counsel claim is rejected.

*Remaining Claims of Error*

Porter also submitted his correspondence with trial counsel regarding disagreements on what claims to include in the post-trial motions. First, Porter complains that he was not present when the Court granted his first attorney's motion to withdraw. (Dkt. 31.) Had he been present, Porter contends that he would have objected to the withdrawal and/or requested to proceed pro se.[3] Porter cannot show that he was prejudiced by his lack of appearance as the Court would have granted his counsel's motion to withdraw over Porter's objection. Likewise, Porter could have filed a motion to proceed pro se upon learning of his counsel's withdrawal. Second, Porter again argues that the government destroyed exculpatory evidence. But Porter puts forward nothing more than speculation in support of his claims, which the Court thus denies. *See United States v. Cherry*, 920 F.3d 1126, 1140–41 (7th Cir. 2019). Any arguments about TFO Hansen's credibility are likewise rejected. Courts "do not reassess the weight of evidence or second-guess the trier of fact's credibility determination." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009).

Finally, the Court rejects Porter's request for the appointment of a legal expert. He argues that an expert is necessary to aid him in researching his legal claims and writing his post-trial motions. After permitting Porter's trial counsel to withdraw, the Court appointed another attorney to represent him. On January 3, 2023, Porter and his new counsel represented that Porter would stand by the arguments made in his pro se and prior counsel's motions. The Court vacated its prior

---

[3] Porter incorrectly frames this as a *Cronic* claim, violating his right to counsel. *See United States v. Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984).

order striking Porter's submissions and permitted them to be fully briefed. Therefore, Porter's request for a "legal expert" is stricken as moot.

**Conclusion**

For these reasons, the Court denies defendant's Rule 29 motions for judgment of acquittal and Rule 33 motions for a new trial [141], [127], [155], [156].

IT IS SO ORDERED.

_____
SHARON JOHNSON COLEMAN
United States District Court Judge

DATED: 7/21/2023

16